No. 2641.

## C. H. HUGHES *v.* THE STATE.

1. PRACTICE—EVIDENCE—BILL OF EXCEPTION to the admission of evidence must disclose the ground of objection; otherwise it is not entitled to be considered on appeal.
2. MURDER—FACT CASE.—See the statement of the case in this, and in the case of ex parte Smith and Hughes, 26 Texas Court of Appeals, 134, for evidence *held* sufficient to support a conviction of murder of the first degree.

APPEAL from the District Court of Leon. Tried below before the Hon. N. G. Kittrell.

The conviction in this case is in the first degree for the murder of Robert Martin, in Leon county, Texas, on the sixth day of May, 1888. A life term in the penitentiary was the penalty assessed by the verdict.

The appellant in this case was one of the relators in the Smith and Hughes habeas corpus proceedings reported in the twenty-sixth volume of these Reports, beginning on page one hundred and thirty-four. Of the witnesses who testified on the habeas corpus proceedings, Messrs Bryan, Vick, Ike Martin, Owens, Bolter, the district clerk, Joyce, Mrs. Susan Hughes and Miss Jennie Hughes testified on this trial, their narratives on the two trials being substantially the same. This report comprehends the testimony of witnesses who did not testify on the habeas corpus proceedings.

Cape Cowart testified, for the State, that he lived in Freestone county, Texas. The deceased and witness's brother Jesse had a herd of cattle at the latter's stock pens, in Freestone county, on the evening of May 3, 1888. The witness, the deceased, Ike Martin, James and George Collins, J. T. Windham, and perhaps others, were at said stock pens on the said evening when the defendant, Ed Smith, James Smith, George Smith, J. P. Parker, Jr., Henry Parker and Louis Davis arrived, each of said parties being armed either with a shot gun or a Winchester rifle. Defendant had a shot gun. One of the party, J. P. Parker, Jr., according to witness's recollection, said that the

party wanted to examine or inspect the herd. Deceased replied that he had no objection to an inspection by honest gentlemen, but that no God d—d midnight assassin could inspect them. The witness and others prevailed on deceased to permit James Smith to examine the herd. Mr. James Smith reported the herd all right, but that it contained an unbranded heifer. Ike Martin, the brother of the deceased, claimed that heifer. The defendant and his party then left.

Shorty Martin, a brother of the deceased, testified, for the State, that a conversation between the defendant and deceased occurred in the hearing of the witness, near the witness's house, between sun down and dark on the evening of May 1, 1888. Ed Smith was with defendant at the time. Deceased told defendant that he was going away soon, and wanted a settlement with him, defendant, who owed him, deceased, for supplies. Defendant replied that if deceased would come to his house they would settle d—d quick. The deceased replied that he had the books, and the place to settle was there. A quarrel then ensued between the defendant and the deceased, in the course of which the defendant said that if the deceased did not mind, he, defendant, would settle with him before he left, between two suns.

West Williams testified, for the State, that on the evening of Friday, May 4, 1888, while he and defendant were working the road, about eleven miles from Buffalo, defendant said to him: "Bob Martin talked to me pretty rough a day or two ago, and I don't intend to stand it. One day ain't always."

Miss Bettie Hay testified for the State, that on the night of Monday, May 7, 1888, about twelve o'clock, she was awakened by the reports of fire arms discharged near the house of her mother. A minute or two after the shots were fired, Mr. Linson came to the house and said that somebody had just shot a prisoner he had in custody. The witness's mother went to the place indicated by Linson, and witness followed as soon as she could get ready. Very soon after the witness reached the deceased, who was then lying on the ground, wounded, he said of his own motion, and not in reply to questions: "Smith and Hughes did the shooting. I saw them by the flash of the gun, and the Parkers are into it." A minute or two later he said: "I am bound to die" or "I am dying." Witness understood him to say: "I am dying." About thirty minutes later he said: "Smith and Hughes did this." Presently he asked wit-

ness and her mother to pray for him, and attempted to pray himself, as directed by witness. Very soon after witness reached the deceased, Linson left to go for Mr. Bradford, who lived but little more than a quarter of a mile distant, and as witness, who was much excited, computed the time, he was gone about twenty minutes. Deceased said nothing, but groaned during Linson's absence. On his return, Linson asked deceased if he wanted some water. He said that he did. Witness then went to the house, fifty yards distant, and returned, making the trip as soon as she could, and it was immediately upon her return that deceased made his first statement. He several times said: "I am dying." He talked at intervals until he died, an hour or more after he was shot, but at no time spoke in a manner to indicate any hope of recovery or other expectation than to die.

Frank Watson testified, for the State, that he was bookkeeper in the mercantile establishment of J. M. Pearlstone & Son. During the year 1887, the deceased became security at Pearlstone's store for supplies furnished the defendant by Pearlstone, and afterwards paid the account.

James Smith testified, for the State, that on his way to Buffalo, on Tuesday morning, May 8, 1887, he stopped at the field of his brother, Ed Smith, where he found his said brother and this defendant, and Messrs. Teeter and Faulk, two young men who were then on their way to inform the relatives of the deceased of the killing of the latter on the night before. The witness, while in the said field, told defendant that he had been told that a straw hat had been found on the ground of the killing. Defendant replied: "I reckon my hat is at home, unless it has been destroyed." As witness rode off, defendant called to and asked witness if he was going to Buffalo. The witness replied that he was, and defendant said to him: "My hat may be at home or it may be destroyed. You get me one while at Buffalo to-day." He then proceeded to describe to witness the place in Pearlstone's store where he would find the hats. Witness asked: "Shall I tell Barney Pearlstone to send you one?" He replied: "No; get me one out of the box behind the door." Witness replied: "I can't do that." Defendant said: "All right; I know my hat is at home anyway, unless the children have torn it up."

H. J. Childs testified, for the State, that he was sheriff of

Freestone county in May, 1888. On the night of Saturday, May 12, 1888, the witness went to the house of Ed Smith and arrested him, the said Ed Smith. After serving the warrant, witness asked Smith where his black straw hat was. Smith pointed to a straw hat hanging on the wall, and said: "There it is." The hat which is now in evidence, being one of the two exhibited on the inquest, looked to be the hat pointed out by said Smith. Smith said he got the hat from Pearlstone on the Friday before the assassination of Martin.

Ed Smith was the next witness for the State. He testified that he was charged by separate indictment with the same murder for which this defendant was now on trial. The said murder occurred on the night of Monday, May 7, 1888. The witness was at work in his field on that day, when he was joined by the defendant, who was armed with a shot gun. About an hour and a half before sun set, J. P. Parker, Jr., and Henry Parker came by the field and spoke to witness and defendant. Defendant followed them to a point behind a hill beyond the view of the witness. Defendant returned to where the witness was in a short while, and told witness that a plot to kill Bob Martin on that night was agreed upon, and that he wanted the assistance of the witness. He then said that he and J. P. Parker, Jr., Henry Parker, W. T. Linson and the negro Lewis Davis were the parties to the plot, and that witness must join them. He then said that J. P. Parker, Jr., told him to tell witness that he, witness, had to go, and that if witness refused or "gave anything away," he, Parker, would kill witness. This was the first intimation the witness ever had that deceased was to be killed. He did not want to participate in the plot, and so informed defendant, but defendant replied that if witness refused, Jimmie Parker would kill him, witness. Thereupon the witness, being afraid to refuse, consented. The witness never at any time, before or after the killing, had any talk with the Parkers or anybody else about the killing. When witness, in view of the threat against his life, agreed to take part in the assassination, defendant told him that the agreement was to meet at a hill near Cedar Creek church about three-fourths of a mile from where the Parkers lived. The witness then left defendant and went to the point in the field where his two sons were burning brush, and after a while returned to defendant, ready to accompany him to the place of meeting, two and a half or three miles distant. The witness

and the defendant left the witness's field about an hour before sun down, and walked to the place of meeting, the defendant taking a double barreled shot gun with him, but the witness had no arms of any character on his person. They arrived at the place of rendezvous about dusk, where, within a few minutes, they were joined by J. P. Parker, Henry Parker and Lewis Davis. The entire party then went to a hill north of the church, when J. P. Parker, Jr., said to defendant: "Well, you know where to go." Defendant answered: "Yes," and the party separated into two parties, the two Parkers and Davis going one way and witness and defendant another. Neither of the Parkers nor Davis spoke to witness on that night, nor did the witness see them again after separating from them as stated. The witness and defendant went direct to the place near Mrs. Hay's house where the shooting afterwards occurred. Defendant took his position behind a black jack tree, south of the road which, from its connection with the main Buffalo road, a few yards distant, leads to Linson's house. He then cut away some undergrowth that obstructed his view of the road. The witness stood about the tree, first on one side and then on the other. Defendant told witness that Linson, having deceased in charge, was to reach the cross road at about twelve o'clock, and was to apprise him, defendant, of their proximity, and would drop behind deceased just before reaching the junction of the roads, and would call to deceased to "turn to the right;" that Linson then was to ride far enough in the rear of deceased to enable him, defendant, to shoot and kill deceased. The witness and defendant were at the tree three hours or more before Linson and deceased reached the cross road. No person came along that road before the killing, except that Lewis Davis came to the tree once and left again. About twelve o'clock Linson and deceased reached the vicinity of the cross road, and Linson, who appeared to be behind deceased, exclaimed: "Turn to the right, Bob; we will go by my house." Deceased turned to the right into the said cross road, Linson dropped behind as agreed, and defendant fired two shots from his gun at deceased. Linson fired two shots and witness and defendant fled from the place through the woods, defendant dropping his hat in the flight.

The witness and the defendant went to the town of Buffalo on the Friday preceding the fatal Monday. They went into the store of J. M. Pearlstone & Son, and witness asked Mr. Owens,

the clerk, for a sack that Dr. Balter was to leave there for him.
He got the sack and directed Mr. Owens to put him up a dollar's
worth each of coffee and sugar.    While Mr. Owens was putting
up the said articles the witness observed a box of black straw
hats.    He asked Owens to give him one of the hats.    Owens
gave him one and told him not to let the "boss" see him with
it.    Defendant then asked Owens to give him one of the hats,
and Owens did so.    Witness then put the two hats in the sack,
and he and defendant got in the wagon and went home.    When
they went to separate that evening defendant thrust his arm in
the sack to get his hat.    He took out one of the hats, remark-
ing: "It makes no difference which I take, as they are both
alike."

Cross examined, the witness said that, during the week pre-
ceding this trial, he testified on the habeas corpus trial of J.
P. Parker, Jr., Henry Parker and W. T. Linson, and on that
trial he testified that he had not talked to anybody about the
killing of deceased, and that he had been promised nothing in
consideration of his testimony.    As a matter of fact, before he
testified on the said habeas corpus trial, and before he went be-
fore the grand jury to testify about the killing of deceased, he
had a talk, in the front room of the jail, with District Attorney
Campbell and Messrs. B. D. Dashiell and F. M. Etheredge.    In
that conversation District Attorney Campbell told witness that
if he would truthfully tell all he knew about the killing of de-
ceased he, Campbell, would not prosecute witness, and witness
would escape punishment.    The reason why witness testified
untruthfully about this matter on the habeas corpus trial was
that Mr. Campbell particularly admonished him, in the said
conversation, not to divulge the agreement.    Witness knew,
when he made the false statement on the habeas corpus trial,
that he was committing a moral and penal offense, and that he
was making himself liable to prosecution for perjury.    He did
it, however, to comply with the instruction of the district at-
torney as he understood it, or, in the language of the witness,
"I done it because the district attorney told me to say nothing
about it."    An indictment was still pending against the wit-
ness, in the district court of Freestone county, for an assault
with intent to murder deceased, committed in the fall of 1887.

Miss Celia Pettigrew testified, for the defense, that, at the
time of the assassination of the deceased, she was teaching
school at Cedar Creek, near the residence of Mr. J. P. Parker,

Jr., and at that time was boarding at the house of the said Parker, occupying a room with Mrs. B. Solomon. She had a distinct recollection of the fatal night, and knew as a matter of fact that J. P. Parker, Jr., was at home with his family on that night, at least until ten o'clock. The witness, Mrs. Solomon, J. P. Parker, Jr., and Mrs. Parker, his wife, sat on the gallery of said Parker's house, engaged in conversation, until about ten o'clock, when Mr and Mrs. Parker retired to their room. Witness and Mrs. Solomon went to their room a few minutes later. A negro girl reported the killing of deceased early on the next morning, Mr. J. P. Parker, Jr., being present, and repeated the current rumor that deceased's dying statement inculpated the Parkers. Witness then vividly recalled the presence of Mr. Parker at his home on the previous night. Witness was not related in any way to the parties involved in this prosecution. Mrs. B. Solomon corroborated the testimony of Miss Pettigrew, placing J. P. Parker, Jr., at home at dark on the fatal night, continuously until he retired with his wife about ten o'clock, and still at home at daybreak next morning.

The substance of the testimony of Mrs. H. C. Parker, the wife of J. P. Parker, Jr., was that her husband came home from work about sun down, ate supper with the witness, Mrs. Solomon and Miss Pettigrew about dark, engaged in conversation with the said parties on the gallery until about ten o'clock, then retired with the witness to their room, when he wrote until about eleven o'clock, when he went to bed with the witness, and remained in bed continuously until day break next morning. Mrs. Parker declared that she was constitutionally of a nervous temperament, easily awakened from sleep, and that her husband could not possibly have left their bed that night without awakening her, and that to her positive knowledge he did not leave it on that night.

The written testimony of Mrs. M. L. Parker, the wife of Henry Parker, as delivered on the habeas corpus trial of W. T. Linson et als., was read for the defense by agreement. The substance of her said testimony was her positive statement that her husband was at his home throughout the entire night of the fatal Monday.

J. C. Collins, George Collins and J. T. Windham testified, for the defense, that they were at Jesse Cowart's stock pen on May 1, 1888, when defendant, James, Ed and George Smith. J. P. and Henry Parker and Lewis Davis came there to look through

Martin's herd of cattle, and that J. P. Parker, Jr., and defendant were the only persons who then had guns.

*Dotson & Richardson,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE.  With respect to the testimony admitted as res gestæ, it is not shown by the bill of exception what particular objection was made thereto.  A bill of exception to the admission of evidence should clearly disclose the ground or grounds of the objection made to the evidence; otherwise it is not entitled to be considered.  (Willson's Crim. Stats., sec. 2516.)

With respect to the admission of the testimony of dying declarations made by the deceased, the bill of exceptions is defective in the same particular mentioned above.  It does not state the ground or grounds of objection made thereto.

No exceptions were made to the charge of the court.  We have carefully examined the charge in the light of the objections made to it on the motion for new trial and in this court, and, in our opinion, it is free from material error—such error as might have injured the rights of the defendant.  It may be that in some particulars the charge is not critically correct, but, considered as a whole, and with reference to the evidence, it is not materially objectionable.

We think the evidence amply supports the conviction.  The testimony of the accomplice witness Smith is strongly corroborated by evidence which tends to connect the defendant with the crime.  Without the testimony of the accomplice witness the guilt of the defendant is sufficiently established by the other evidence.

We have found no error in the conviction, and the judgment is affirmed.

*Affirmed.*